Good morning, your honors, and may it please the court. Todd Borden from the Federal Public Defender's Office, and I represent the appellant, Thomas Keller. Judge Bennett, I'm going to endeavor to save three minutes for rebuttal. I will watch the clock. I have three issues today. They're pretty distinct. I plan to go over them by first discussing the suppression matter, then non-delegation, then sentencing. Although, please, if any of you have a burning desire to hear anything else in a different order or sooner, please let me know. As to the suppression, the district court erred when it refused to hold an evidentiary hearing on whether Agent Munoz was able to immediately discern that Keller's diary contained patient information. Particularly here, where two other agents testified, it took months of study for them to be able to understand Keller's handwriting, which very much lived up to the stereotypes. So there's no question that the warrant specifically authorized the seizure of journals, right? That's right. And there's no question that from essentially immediately looking at what you're saying you wanted an evidentiary hearing on, aside for the moment from the content, it would be almost immediately apparent that this was a journal, right? Yes. All right. Go ahead. So I agree with that, Your Honor. The other thing I guess I would point to is that in the context of the warrants, journal appears in the context of a number of professional documents. Journals and ledgers, for example, are mentioned in the warrant application. So I do think there's a question about whether or not this is a journal as opposed to a personal diary, particularly given the content of it. Well, one of the categories, though, and I'm looking at, I think, ER 2296, which I think is the first page of attachment B, journals, et cetera, et cetera, et cetera, that refer or relate to the ordering, prescribing, or dispensing of any controlled drug. And wouldn't it be almost immediately apparent upon, for example, opening the one that has the cover page, University of California, Berkeley, that this refer or relate to ordering, prescribing, or dispensing any controlled drug? So I would dispute that, Your Honor, in that if you look at the journal, I mean, the first page, for example, it's the weather, it's politics, the sort of indignities of aging. It's all sorts of purely personal matters. There's nothing that's professional there. Scattered in here and there, there are occasional sort of complaints about patients and things like that. But I would dispute that it is immediately apparent. And I think, at the very least, we should have had an evidentiary hearing on this question. Just ask them. I mean, it is, after the work that's gone into understanding the handwriting, it is apparent that he's talking about patients. So really, the question is, at the time, was that apparent? And, you know, Judge Chabria looked at this and said, you know, even it is, there's some things that are hard to read. But, you know, even on a quick perusal, you can see that there's patient names and medical terms used. So why is that wrong? So I guess I'm not making a necessarily clear error argument there. What I am making is an argument that it's a hard standard for you to make. But I think the argument I am making is that he functionally made a fact finding on a disputed fact. I think we did raise, you know, by pointing to the other agent's testimony that it took months of study to understand what was on there. I think we raised a material factual dispute on this question. And I think we should have gotten an evidentiary hearing just because functionally a dispositive aspect of his order hinged on a factual finding that we maintain is disputed. I don't want to take you off your order, but I would be curious to hear from you on the sentencing issue. I'm happy to go there. Okay. So our position is the district court here erred when it deferred to the guidelines commentary definition of converted drug weight, which is really what overwhelmingly drove Dr. Keller's guidelines calculations here. And it's really for two reasons. First, the commission improperly promulgated what is really just an empty placeholder definition of converted drug weight that relies entirely on the commentary to define the concept. But second, and perhaps I think even more clearly, the converted drug weight definition here, at least as it pertains to oxycodone, is not reasonable and does not fall within the zone of ambiguity for the guidelines text. But why is it not actually just incorporated, expressly incorporated into the guideline itself? So, Your Honor, I point the court to Castillo, which is sort of the leading case now within the circuit on the question of Kaiser and its application to the guidelines. And there the court held quite broadly that guidelines commentary, no matter what, is subject to the strictures of Kaiser. So I don't think the government's correct that simply because the text of the guideline refers to commentary, that commentary isn't subject to the same, you know, set of restrictions that are contained. I mean, you know, one document can incorporate other documents. That's a common thing in drafting of provisions and contracts and lots of things. And here we have the actual guidelines that expressly refer to the commentary and incorporate them, which is different than Castillo. It is different, Your Honor. But I guess I would say that the separation of powers concerns that drive the whole reason for having, you know, sort of going back to Stinson, the reason why, you know, guidelines commentary has to go through notice and comment rulemaking and has to be submitted for Congress for congressional approval, we have a situation where there's that mandatory congressional review for the very thing that actually drives the entire guidelines here didn't happen. It did go through congressional review here, right? Okay. So I misspoke, Your Honor. In this case, it happened to have gone through it. I should note, though, in Castillo, it's the exact same thing. It also went through congressional review. But, you know, our position is that, and the courts have consistently held this, that despite the fact a piece of commentary may go through congressional review, that's sort of just a, you know, a sort of a superfluous action by the commission, because Congress, as this Court has held, doesn't actually have the authority to reject or modify that guideline, the guideline commentary. So, counsel, I have a, on the same issue, a different question. As you're aware, the government has argued even if there was error, it was harmless. Yes. And you've said no, it isn't. That's right. So it's a pretty long sentencing transcript. Yes. And we've all read the entirety. And what I take from this is the district judge said many, many, many times that there are issues with the converted drug weight, there are issues with the guidelines, but when he looks at the facts and all of the 3553A factors, sort of irrespective of the guidelines and the converted drug weight, given especially that somebody died, which he mentions, that this is the sentence. And you've sort of argued that the words he used aren't enough. Are there magic words? Not magic words, Your Honor. I really point the Court to the Munoz-Camarena case. That sort of outlines four sort of examples of where a guidelines error may be harmless. But they're not listed as it has to be. That's true, Your Honor. And I mean, to me, having read this transcript, unless they're where I am right now, and you can convince me otherwise, is if there aren't, if there isn't the requirement of magic words, this judge did everything that he could possibly do to indicate that under 3553A, irrespective of the converted drug weight, all of the factors which he went through in detail, this is the minimum sentence. It's never going to be lower than 30 months. Why doesn't that work? Well, Your Honor, a few reasons. First, Judge Chabria did not, in fact, acknowledge the guidelines range that we argued for and now argue for an appeal. Because they aren't as simple. Correct, Your Honor. And so I think that, and the other thing to bear in mind is, you know, going all the way back to Gall, really the first big post-Booker decision talking about sentencing procedure, the Supreme Court emphasized the guidelines, though advisory, are the starting point and initial benchmark. And here, the guidelines range we're advocating for an appeal was never, ever acknowledged by Judge Chabria. And so, you know, I don't think it can be that the judge can sort of just say, you know, what happened here, the guidelines are complex, but I'm just, we're not going to really do, this is not really going to be a guideline sentencing case. We're just never going to calculate them. The Supreme Court has said that is categorical, and this Court in Cardi has said that's categorically procedural sentencing error. So Judge Chabria needs to, you know, start from what the actual guidelines range is. And he did not do that here. I acknowledge it was a thoughtful sentencing hearing. And he, you know, but without having acknowledged the guidelines range we're asking for, it's hard to say the error was harmless because he never really took into account that position. Although he did certainly indicate he'd read everything that everybody had submitted. Well, that's true, Your Honor. That's true, Your Honor. But the sentencing briefing in this case was fairly voluminous, and there was kind of a layered set of arguments being made by the defense. So it's, there was a, you know, a Kimbrough argument about sort of the, a policy challenge, really, to the commentary's definition of oxycodone. There was disputes about drug weight. So there were, there was a lot in play there. And I do think it is notable, the fact that he did not actually ever, you know, didn't say Kaiser, didn't talk about, you know, sort of any of these Stinson sort of arguments, nor acknowledge the ultimate guidelines range we're advocating for. So I think, and finally, I'd just note that, you know, guidelines error is sort of a unique sort of sentencing error that is almost always harmful, particularly I'd point to the Supreme Court's decision in Molina-Martinez, where even on a plain error standard, the Court said, you know, most of the time, usually, even on plain error, a resentencing is going to be warranted. And I know you've told us correctly, I think, that this is not a mood issue when your client gets out because of the supervised release. That's right. But when is your client currently scheduled to get out? He is out now. So he's out now. If there aren't further questions on the sentencing matter, I would like to briefly make a pitch for the non-delegation doctrine. So here, the Controlled Substances Act sets out no legal standard for when physicians who are authorized to prescribe controlled substances become felons. Instead, the substantive legal standard for criminal liability comes solely from an administrative regulation promulgated by the Attorney General, and that's the 21 CFR 1306.04. This violates the non-delegation doctrine because there was no intelligible principle guiding the Attorney General in promulgating that regulation, which, strangely, by its own terms, purports to impose criminal penalties through the regulation itself. So there's no principle where the Attorney General may promulgate and enforce any rules, regulations, et cetera, which he may deem necessary and appropriate for the efficient execution of his functions under the chapter, which include designating pursuant to statutes for the manufacture, distribution, and dispensing of controlled substances. Yeah, and I think Your Honor is quoting the 871 language. Yes, 871 and then 821. Yeah, so a few points there, Your Honor. I don't think provides a sufficient intelligible principle. It's incredibly broad, and I guess I would contrast that with the Toobie decision, which involved a non-delegation challenge to the Attorney General's authority, delegated by Congress, to temporarily schedule certain substances on Schedule I. But there, the Court upheld against the non-delegation challenge, but there was really an intricate set of factors the Attorney General was required to consider. And you're also arguing we should adopt a special non-delegation rule in criminal cases? That's right, Your Honor. Has anybody ever done that? So Toobie lets the question open, and Justice Gorsuch's dissent in Gundy strongly suggests it. So your answer to my question is no. That is correct, Your Honor. Yeah. So I have one procedural question on this issue. The Supreme Court has granted cert in a case that's going to present a non-delegation issue. Right. Do you think that we should sit on this issue until they decide that case? That would be my request, Your Honor. My client's out, so, you know, sort of the — I think the sentencing issue is an interesting one, but — and not harmless, to be clear. But I acknowledge, as a practical matter, it — waiting, I think, is definitely fine. And I think, unlike some of the prior non-delegation doctrine cert grants, this one, like — like the Juresky case, for example, they ended up deciding that on a Seventh Amendment civil jury trial right, and they sidestepped it. But this one, the two questions presented both squarely pose non-delegation. And insofar as I do think there's pretty strong — you know, Gundy, there was no majority opinion. It was just a plurality. The doctrine does seem to be somewhat in flux. So, yes, that's a long-winded answer of saying yes, Judge Forrest. If there are no further questions, I'd like to reserve the balance of my time. Kelly Volkar. Good morning, Your Honors. Please, the Court. Kelly Volkar on behalf of the United States. This Court should affirm Keller's conviction because, first, the District Court did not err in denying Keller's motion to suppress his journal because it squarely fell within the scope of the warrant where it referred to patient names and dispensing controlled substances. I'd like to start by addressing a couple of the questions of the Court on that topic before moving to sentencing and the other issues discussed. First, labeling the journal as professional versus personal reads a gloss into the warrant that simply isn't there. As Judge Bennett noted, attachment B is clear in what was within the scope of the warrant. And that included journals, books, records, or correspondence. And it all started with the phrase, documents including but not limited to. And then it said, journals, books, records, or correspondence that relate to or refer to the ordering, prescribing, dispensing of any controlled drugs. This, there has never been any dispute about the content of the journal, what is actually stated. The only dispute has been over how quickly the agent could have discerned what those words said. And maybe you're getting to this, but sort of to follow up on some questioning that Judge Bress had to your friend across the aisle, what is your argument in terms of if we were to look at that and conclude, well, I don't know, I can't figure out that handwriting, I have no idea what that says. Might fall within the scope of the warrant, might not. What's the governing law in terms of what do we do in the meantime as we figure that out? Well, Your Honor, first the she case that I cited in my brief is instructive on that in the sense of that was a case where the agents gathered documents that were in Chinese and did not have a Chinese interpreter there. However, the court, the Ninth Circuit held that it was reasonable to conclude that they fell within the scope of the warrant. But here we have more than that. Here we have the district court making a factual finding, as Judge Bress noted, that upon a quick perusal of the journal, there were certain words, there were certain phrases that were discernible. And even if every word couldn't be read in the moment that the agent picked up multiple different journals and identified this particular one as falling within the scope of the warrant, it was sufficient, there was enough that the agent could determine, could identify sufficient terms that this particular journal he did seize did fall within the warrant. And the district court said upon a quick perusal, it was clear that there were patient names and medical information and things of that nature. And just, I'm not sure Your Honor has reviewed the journal, but within just the first few pages, and particularly when the doctor wrote in all caps, it was discernible that on page two, there were multiple different names. There was information, medical information, such as age, height, and condition, if I'm not mistaken. Within the first few pages, there were multiple references to pain doctor or being a legal drug dealer. Within the first two dozen pages, there was information about how much financial, monetary revenue his business was making. Again, upon a quick perusal of the journal, even if every word couldn't have been made out at the moment the agent reviewed it, there was enough identifying information that it did fall within the four corners of the journal. And the warrant, I'm sorry, within the four corners of the warrant. And the warrant itself did not make a professional versus personal distinction. And again, Judge Chabria's finding would be entitled to clear error review in the government's perspective. Moving to the sentencing issue, unless there are further questions on the journal, the district court did not err in using the converted drug weight that is expressly incorporated by reference from the commentary to the text of the guidelines. As Judge Bress was exploring with my colleague, my friend across the aisle, this is different than the drug weight Castillo. In Castillo, there was text and there was commentary, and they were inconsistent with one another. One in the text had a list that did not include inchoate crimes, and the commentary had a list that did include choate crimes. That is far from the situation that we are faced with here, where the drug related guidelines have a very different structure, intent, and purpose. And that structure, intent, and purpose is to have the most commonly listed drugs in the body of the text, heroin, fentanyl, cocaine, methamphetamine, et cetera. And then for other drugs and or if there's a combination of drugs, it uses a catch-all provision labeled converted drug weight. Above the line, converted drug weight is explicitly described as referring to the tables that are included in the commentary. Should we think at all about the fact that, as has been pointed out, when that change was made, it went through notice and comment. It went through a formal process. But my understanding is that the commentary, that table that's in the commentary, could change without going through such a formal process. So should we think about that in terms of, I mean, I agree with you. It looks like there's an express incorporation. The guideline itself references this table and says it's in the commentary. I don't know how else you expressly reference something. But if it's expressly referenced something that could change without a formal process, I guess I'm rambling a bit. So how does that factor into our analysis of this issue? Yes, Your Honor. And I will note that my friend across the aisle points out that the commentary may not be modified or disapproved by Congress. And I will say we do have at least one example, and it's in the Kimbrough case, actually, where the Kimbrough case talks about the crack cocaine and the ratio. And the Sentencing Commission tried multiple times to change the ratio from that 100 to 1. Congress rejected it. And when I looked at the citations that the Kimbrough case refers to, it rejected not just the text, but also the commentary. And I say that to Your Honor's question because I think that we live in a world where it is up to the Sentencing Commission whether or not they submit that commentary. But I think that they would be opening themselves up to particular scrutiny and potentially an arbitrary and capricious challenge if they were just to change that ratio day to day. And again, that's not what we have here. To me, your argument that it is here effectively part of the guidelines and should be regarded as part of the guidelines doesn't work if the commentary was not actually submitted to Congress and went through notice and comment. Because if it didn't, then it's really shouldn't, as a formal sense, doesn't really seem like a guideline. So I think your argument does depend on the fact that this table did go through that process. That's correct, Your Honor. And it really depends on the fact that here is incorporated by reference, and it avoids the separation of powers issues that I think were raised in Castillo because it was submitted. Well, my point is what happens going forward? Is it going to have to go through that formal process if anything happens in the commentary going forward? And if your answer is yes, what's the authority for that? Your Honor, I think to answer both Your Honor's questions, I would start by saying I think it is incorporated by reference here, and it did undergo the comment and review process with Congress. We do have examples from the Kimbell case when Congress has rejected text and commentary. And I think, Your Honor, if going forward the Sentencing Commission were to change it and not submit it for congressional review, I don't have any authority on what would occur in that instance. I'm not sure that it has happened. Counsel, does the government still maintain its position that even if there were error, it was harmless? Yes, Your Honor. So your discussion of that is fairly short on page 62 of your brief. And unless I'm missing it, it does not explicitly address your friend's argument that here it couldn't possibly be harmless because the district court did not explicitly mention their proposed guideline range of 0 to 6. So if I'm right that that's not explicitly addressed on page 62, why don't you tell me what your argument is as to that specific question where your friend is saying that at the very least the court had to have acknowledged their 0 to 6 guideline range. And without that acknowledgement, it can't be harmless. Yes, Your Honor. As Your Honor pointed out, and my friend across the aisle noted, there were multiple arguments in the alternative that were made at sentencing. The district court had both parties walk through their calculation. It was the defendant who walked through the calculation that led to the guidelines the district court ultimately adopted, the 51 to 63 months. And that was based on a drug quantity for the counts of conviction, rather all drugs prescribed to AM over the course of their relationship. But they certainly were not, by doing that, abandoning their written argument as to the Kaiser issue, right? That's correct, Your Honor. And I'm trying to find the citation. I don't have quite at my fingertips. But the district court did say in the sentencing hearing that it would not consider a noncustodial sentence. And I would argue that that is the most powerful example of even though the district court didn't say I'm not going to find a range of 0 to 6 months, the district court did say this isn't a case where a noncustodial sentence is appropriate. Right, that's true. But that doesn't really answer, that just tells us that Judge Chabria, no matter what, was going to give some time in prison. I mean, here your argument requires us to conclude that it's more probable than not that Judge Chabria would have given a sentence that's five times the upper range of the guidelines, 30 months as compared to six. I don't see what evidence in the record there would be for that. Your Honor, the evidence I point to in the record, and I did find the citation for what I was referring to, it's 1 ER 21. The evidence in the record for that, Your Honor, is Judge Chabria's repeated statements that the 3553A factors were what were driving his sentence and that he didn't think a noncustodial sentence was appropriate here. And I would say that in saying that, he was implicitly rejecting the idea that the drug simply couldn't be counted, that simply because the ratio for Oxy is 6,700 to 1, and it's simply because of the policy arguments, because there was also the Kimbrough policy arguments were argued in the sentencing hearing as well, that none of those arguments were moving him below 30 months. Do you think it's reasonable to conclude that if Judge Chabria had believed the range was zero to six months, he would have imposed a sentence of 30? Your Honor, I believe so based on what he said. And I agree with Judge Bennett's questions to my friend across the aisle. I don't know how the district court could have been clearer. And we don't make harmlessness arguments for sentencing in every case. But this is a case where the judge did walk through multiple different calculations, did not explicitly say zero to six months, however, did find that a noncustodial sentence would not be appropriate, and the 3553A factors dictated nothing less than 30 months. What you're looking at is where the district court said applying the 3553A, regardless of the amount, and there he's talking about the drug quantity, regardless of the amount, applying the 3553A factors, the idea of a noncustodial sentence in this case seems virtually impossible. So that's where you were quoting from, right? That's correct, Your Honor. And the only place where the noncustodial, because as you indicate, your walked through a guideline range that included the drug conversion. And so the only place a noncustodial sentence was even on the table was in the zero to six. That's correct, Your Honor. That's your argument on the judge essentially saying the zero, without saying zero to six, when he talks about noncustodial, that's the only place where it was suggested. That's correct, Your Honor. And I will also note, as Your Honor pointed out to my friend, the defendant is out. He has been released from custody as of two months ago. And this court's cases are clear that where remanding for resentencing would allow a shorter term or no term of supervised release to be imposed, that renders it not moot. But I would note that this is a case where, as the PSR paragraph 74 shows, it is a mandatory minimum three years of supervised release. And there is no discretion. So if it is remanded for resentencing, the district court will have to simply just reimpose the three years of supervised release. I didn't get the chance to brief that. Sorry. I apologize. You may have fully talked through this, and I missed it. But how do you distinguish the Dominguez-Cicedo case where we basically said, District Court, you can say all day long that no matter what happens, the sky could fall. I'm giving this sentence. And that doesn't insulate you from starting at the right starting point. That's correct, Your Honor. Not distinguished, but I believe it does state that it's a non-exhaustive list. I do think that it's meant to be applied in very narrow circumstances when it comes to sentencing. But I simply agree with Judge Bennett that this is one of those circumstances where the district court took great care to analyze each of the defendant's different arguments. There were multiple different guideline calculations that were possible here. The district court walked carefully through each of what those were. He made his finding, our argument is still that he was correct in the sense of he could look to the commentary because it was incorporated by reference. But even if he didn't, I think that he made it as clear as he could that he still would have, even if the range were different, he still would have found based on the 3553A factors that the sentence should be 30 months. And I think that because it was a non-exhaustive list in that case from this court, that this is as clear as the instance where the harmlessness should apply. I don't think that really is accurate to say he couldn't have been clearer. I mean, clearly he could have formally acknowledged the zero to six month range and said nonetheless would impose 30, which he didn't do. So that's something he could have done. I mean, I think the issue here for your position is cases like Dominguez, like Munoz Camarena, which discuss these issues and have encountered them in situations that seem frankly even more favorable to the court. Your Honor, I guess respectfully I would say that I think they were non-exhaustive. They were examples, but I think that here there could still also be, this is still a situation that should be harmless. And again, because I'm low on time, I really want to pivot back to our main argument, which is that the court need not reach harmlessness if it finds that there was no sentencing error in the first instance because the commentary is incorporated by reference in this specific provision. And also I do want to note, because it's in my friend's brief and the reply brief, the court recently after our brief handed down the Trumbull case and it found that the fact that the commentary underwent review by Congress was important to the third step of Kaiser. So we didn't get to discuss it today, but if the court doesn't agree with our incorporation by reference argument, there is still the fact that we would survive scrutiny under the Kaiser framework. Counsel, you're out of time. One final question. Does the government have a position as to whether on the delegation question we should wait for the Supreme Court? Yes, Your Honor, the government's position is that you should not wait for the Supreme Court. And the reason there is because, as Judge Bress is familiar with Mel Gardeas, this is another case where Congress has designated a crime. It is a crime to distribute drugs. Congress only delegated to the Attorney General the ability to fill out the details of who is authorized and who is unauthorized. And as we describe in our briefs, there's many statutory phrases that the Attorney General has to work from in terms of determining when and when that the physicians are authorized, registered physicians are authorized or not authorized. And when they are operating outside of the scope of their usual practice, they are not authorized. And I do not think that the question before the Supreme Court that Judge Forrest referenced, which is in a civil case, I don't think that's going to change that basic concept. All right. Thank you, Counsel. Thank you, Your Honor. I'm going to confine my comments to just a few things related to the sentencing argument. As far as the incorporation by reference, I think it's important to note that there's no real limiting principle to the government's position. Under their view, as long as the commission could promulgate a guideline where they simply say the offense level for this is as articulated in the guidelines commentary below, and then the entirety of what, you know, that guideline would be would purely come from the commentary. Isn't the limiting principle that it has to go through the same process that a guideline would have to go to? And if it doesn't, then you would be right. So I don't – I guess I disagree, Your Honor, that whether or not this particular guideline went through the notice-and-comment rulemaking and submission to Congress – sorry, I should say this particular commentary went through that. I don't think that's dispositive. Otherwise, Castillo would have had to have been decided the other way. The guidelines commentary in Castillo went through notice-and-comment rulemaking and was submitted to Congress. That's what Judge Pryor of the Eleventh Circuit said in their en banc opinion in Dupree. Right. But it didn't have the express incorporation in the way that we have here. I mean, I suppose, but I don't – I'm not sure why that distinction matters here because, you know, if – if what's – if what matters is that it goes through the commentary – it goes through the process or not, then, you know, I guess I don't see that as being a critical distinction. The other thing I'd point to is the – this Court's pre-in Pinto decision where it expressly stated that Congress lacks the power to modify or disapprove of the application notes. That's this Court's precedent. I know my friend on the other side says that may have happened in the crack context, but the crack – and that's the first I've heard this argument. I haven't researched it, but the crack disparity issue, that is in the text of the guideline. There might be some commentary that also talks about it, but crack cocaine is one of those major substances that's in the text. So I don't think that would be dispositive. Go ahead. You know, the fact that it went through notice and comment, it's sort of like it's not – and I think this is where Judge Rest is coming from, perhaps, of sort of – it's not commentary anymore. It's been elevated because it's gone through a different process. So in terms of my question about what do we do going forward, is it commentary or is it guideline going forward, and how can it be changed, and is it subject to a formal process? I mean, would there be any mechanism for us to just be like, well, it looks expressly incorporated, so we're going to deem it commentary even – or I'm sorry, we're going to deem it guideline, even though it's labeled in the document commentary. I've seen – I don't think so. I've seen no court that has taken that approach. I mean, there's been – you know, Kaiser's been out for a while, and I just – that approach I just don't think has any support in any case law I've seen, and I don't think the government has pointed to any. Well, it's a kind of new problem because, you know, in light of Castillo, we're now having to examine the relationship between the guidelines and the commentary, and of course the Sentencing Commission is doing the same thing by elevating some of what's in the commentary into the guidelines and some of the most recent amendments, not in the case here yet. Right. That's right. And it's notable that – I mean, that's why I don't think it's – you know, the consequences of this are necessarily so severe from the Court's perspective because we have a functioning Sentencing Commission at the moment, and after Castillo, the Sentencing Commission did – you know, they moved that language from the commentary to the guidelines text. So, you know, it – so I think the Commission at least on some level recognizes that that has to happen, and I think it's not necessarily any different here. I see that I'm over, so barring any further questions, I would urge the Court to reverse. All right. We thank counsel for their arguments, and the case just argued is submitted.
judges: BENNETT, BRESS, FORREST